OREGON NATURAL RESOURCES COUNCIL; Hells Canyon Preservation Council; Friends of Lake Fork; Ric Bailey, Plaintiffs–Appellants,

v.

Richard LYNG, Secretary of Agriculture; U.S. Forest Service; Robert Richmond, Wallowa–Whitman National Forest Supervisor, Defendants–Appellees,

Eagle Cap Logging, Inc.; RMH Aeroservices, Inc.; Boise–Cascade Corp.; Ellingson Lumber Co.; Idaho Timber Corp. of Oregon, Inc.; North Powder Lumber Co.; Sequoia Forest Industries; Union Forest Products Co.; Northwest Timber Workers Resource Council; Save Our Snake, Defendant–Intervenors–Appellees.

No. 88–4092.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1989.

Decided July 21, 1989.

Gary K. Kahn, Portland, Or., Kerry L. Rydberg, Eugene, Or., for plaintiffs-appellants.

John A. Bryson, Washington, D.C., for defendants-appellees.

Michael E. Haglund, Portland, Or., for defendant-intervenors-appellees.

Before WRIGHT, REINHARDT and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Plaintiffs Oregon Natural Resources Council, Hells Canyon Preservation Council, Friends of Lake Fork, and Ric Bailey (collectively "ONRC") appeal the district court's dismissal of their action for declaratory judgment, mandamus and injunctive relief. Alleging violations of the National Environmental Protection Act ("NEPA"), the Clean Water Act ("CWA"), and the Hells Canyon National Recreation Area Act ("HCNRA Act"), ONRC sought declaratory relief and an order enjoining the forest service from offering a timber sale in the Duck Creek area of the Hells Canyon National Recreation Area ("HCNRA") in the Wallowa–Whitman National Forest. ONRC also sought a mandatory injunction compelling the Secretary to promulgate regulations under section 10 of the HCNRA Act, 16 U.S.C. § 460gg–7. Final-

ly, ONRC requested costs and attorneys' fees in accordance with the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm in part and reverse and remand in part.

## BACKGROUND

The Hells Canyon National Recreation Area was established by Congress in 1975. It encompasses 652,488 acres of land in Eastern Oregon and Western Idaho, most of which had been managed under the National Forest System. This land, which includes the deepest gorge in North America and the seventy-one mile segment of the Snake River between the Hells Canyon Dam and the Oregon–Washington border, became the Hells Canyon National Recreation Area. The specified purpose of the HCNRA Act is "[t]o assure that the natural beauty, and historical and archeological values" of this area "are preserved for this and future generations, and that the recreational and ecologic values and public enjoyment of the area are thereby enhanced...." [1] 16 U.S.C. § 460gg(a).

The Act requires the Secretary to develop a "comprehensive management plan" ("CMP") that provides for a "broad range of land uses and recreation opportunities" in the HCNRA. 16 U.S.C. § 460gg–5. In accordance with NEPA, and after consulting with a large number of federal, state and local agencies, elected officials, and private organizations, the forest service prepared an Environmental Impact Statement ("EIS") to aid in formulating the CMP. The EIS, issued in May of 1981, identifies key issues and concerns pertinent to the management of the HCNRA and proposes seven alternative plans for managing the area. The CMP, finalized in 1984, designates "Alternative C" as the HCNRA management plan. This alternative allocates the HCNRA to seven land-use classifications. Twelve percent of HCNRA land, including the Duck Creek area at issue in this appeal, is designated as "dispersed recreation/timber management." This designation permits timber management but requires it to be consonant with providing "ample opportunities for dispersed recreation." Permissible timber management activities include salvage cutting and the harvest of between five and nine million board feet of timber each year.

In November of 1981 a violent storm toppled many trees in the HCNRA. During the following two summers bark beetles attacked storm-felled Engelmann Spruce trees in the Duck Creek area. By the summer of 1984, the bark beetle population had begun to attack standing green trees. The voracious beetles had infested virtually all large Engelmann Spruce trees in the Duck Creek area by the summer of

---

**1.** Section 7 of the HCNRA Act provides a more detailed description of the Act's objectives:

[T]he Secretary shall administer the recreation area in accordance with the laws, rules, and regulations applicable ‡to national forests for public outdoor recreation in a manner compatible with the following objectives:

(1) the maintenance and protection of the freeflowing nature of the rivers within the recreation area;

(2) conservation of scenic, wilderness, cultural scientific, and other values contributing to the public benefit;

(3) preservation, especially in the area generally known as Hells Canyon, of all features and peculiarities believed to be biologically unique including, but not limited to, rare and endemic plant species, rare combinations of aquatic, terrestrial, and atmospheric habitats, and the rare combinations of outstanding and diverse ecosystems and parts of ecosystems and parts of ecosystems associated therewith;

(4) protection and maintenance of fish and wildlife habitat;

(5) protection of archeological and paleontologic sites and interpretation of these sites for the public benefit and knowledge insofar as it is compatible with protection;

(6) preservation and restoration of historic sites associated with and typifying the economic and social history of the region and the American West; and

(7) such management, utilization, and disposal of natural resources on federally owned lands, including, but not limited to, timber harvesting by selective cutting, mining, and grazing and the continuation of such existing uses and developments as are compatible with the provisions of sections 460gg to 460gg–13 of this title.

16 U.S.C. § 460gg–4.

1987. Health and life departed from the Duck Creek area, which held an estimated twenty million board feet of dead and dying Engelmann Spruce timber by early 1988. Because Engelmann Spruce is a soft white wood that deteriorates quickly, salvage value of this specie declines rapidly after the year of infestation.

The forest service responded to the bark beetle epidemic, which has spread to other areas of the HCNRA, by preparing a site-specific "Environmental Assessment" ("EA") for the Duck Creek area. This EA, issued in February of 1988, identifies issues and opportunities related to the beetle problem and considers six alternative methods of managing the Duck Creek area's beetle-infected spruce. These methods range from taking no action to harvesting fifteen million board feet of timber. The EA designates "Alternative F" as the preferred alternative. On April 3, 1988, Robert Richmond, Supervisor of the Wallowa–Whitman National Forest, approved this alternative and concluded that its implementation would not have a significant impact on the quality of the human environment.

Alternative F calls for the harvest of approximately six million board feet of beetle-threatened, beetle-infected and dead trees from the Duck Creek area. The harvest is to be accomplished by cable logging and helicopter systems in order to protect wet areas and soils on steep ground and to avoid having to build a road system in the large, "unroaded" section of Duck Creek. The proposal leaves nearly sixty percent of the damaged timber unharvested in wildlife and visual areas and in riparian no-cut zones. The sawlog volume removed will postpone or defer cutting of an equal amount of volume on lower priority timber stands. Alternative F also requires that spruce "stringers" in a particular section of the Duck Creek area be left unharvested so as to protect elk habitat and migration.

On June 21, 1988 plaintiffs-appellants filed their complaint seeking declaratory, injunctive and mandamus relief from the proposed timber harvest. Plaintiffs-appel-

lants also filed a motion for a temporary restraining order on the same day. On June 27, 1988 District Judge Owen Panner imposed a temporary restraining order, effective from June 23, 1988 to July 12, 1988. The contract for the Duck Creek timber sale had been awarded to Eagle Cap Logging, Inc., the only bidder, on June 23, 1988. Eagle Cap intervened in this action after a bench trial on the merits. Judge Panner found for defendants-appellees on July 11, 1988. Plaintiffs-appellants appealed this judgment and filed a request for an emergency injunction pending appeal both with the district court and with this court. Both requests were denied. Timber harvesting began in July of 1988, after Judge Panner's decision, but was suspended for the winter months. We heard oral argument in this appeal on February 8, 1989. On April 25, 1989, ONRC filed an emergency motion with this court seeking an injunction pending our ruling. We denied this motion, and logging resumed in late April.

## ANALYSIS

### I  *The National Environmental Protection Act*

■ The National Environmental Protection Act requires federal agencies to file an environmental impact statement before undertaking "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A federal agency must continue to gather and evaluate new information about the impact of its actions on the environment after it has released an EIS. *Oregon Natural Resources Council v. Marsh*, 832 F.2d 1489, 1494 (9th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 2869, 101 L.Ed.2d 905 (1988). When "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact" arise, the agency must prepare a supplemental EIS. 40 C.F.R. § 1502.9(c)(2)(ii). If an agency is unsure whether a proposed project requires an initial or supplemental EIS, federal regulations [2] direct the agency to prepare an

---

**2.**  Pursuant to an Executive Order, the Council

on Environmental Quality issued regulations to

environmental assessment on which it may then base its decision. *See* 40 C.F.R. § 1501.4(b)–(c). The role of the EA is thus to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9.

■ Courts must uphold an agency determination that a supplemental EIS is not required if that determination is not arbitrary and capricious.[3] *See Marsh v. Oregon Natural Resources Council,* — U.S. ——, 109 S.Ct. 1851, 1859–60, 104 L.Ed.2d 377 (1989). The decision not to prepare a supplemental EIS will not be considered arbitrary and capricious if it appears from the record that the agency has based its decision on a reasoned evaluation of the relevant factors. *Id.* 109 S.Ct. at 1861–62.

Appellants base their attempt to undermine the forest service's decision not to supplement on the EA. They contend that the EA does not adequately address the factors contributing to the environmental impact of the bark beetle epidemic and timber sale. They argue first that EA minimizes the significance of the beetle attack and timber sale by failing to afford adequate consideration to their combined effect on elk, other wildlife, and water quality. Second, they allege that the EA is per se inadequate to support a finding of no significant impact because it fails to analyze the cumulative effect of the Duck Creek timber sale, to examine seriously the no-action alternative, and to obtain missing information or provide a worst case analysis. On the basis of these contentions appellants conclude that the forest service violated NEPA by finding the EA a sufficient basis on which to rest a decision regarding the fate of the dead and dying timber in the Duck Creek area.

■ Judge Panner found that the EA was not inadequate in the respects alleged and that defendants-appellees thus reasonably decided not to prepare a supplemental EIS. We review the findings of fact underlying Judge Panner's decision for clear error. *Cf. Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 493 (9th Cir. 1987) (applying clearly erroneous standard to findings of fact supporting district court's decision that EIS was legally adequate). We review *de novo,* however, Judge Panner's implicit conclusion that the forest service's decision not to supplement was not arbitrary and capricious[4] but based on a reasonable evaluation of the environmental consequences of the Duck Creek timber sale. *Cf. id.* (ultimate decision that EIS complies with NEPA and Council on Environmental Quality regulations presents an essentially legal question, which we review *de novo*).

■ We find that Judge Panner correctly decided that a supplemental EIS was not required. We agree with the district court that the EA was not inadequate in

guide federal agencies in the implementation of NEPA. *Sierra Club. v. Penfold,* 857 F.2d 1307, 1312 n. 9 (9th Cir.1988) (citing Exec. Order No. 11991, 42 Fed.Reg. 26, 967–68 (1977)). These regulations are binding on all federal agencies and guide courts in interpreting NEPA requirements. *Id.* (citing 43 Fed.Reg. 55,978 (1978)).

3. At the time the district court rendered its decision, case law mandated that the agency's decision not to supplement be reviewed under a reasonableness standard. *See, e.g., Connor v. Burford,* 848 F.2d 1441, 1446 (9th Cir.1988); *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 858 (9th Cir.1982). Subsequent to the district court's decision, however, the Supreme Court held that, although the agency must apply a rule of reason in deciding whether to prepare a supplemental EIS, a court may only overturn the agency's decision if it is arbitrary and capri-

cious. *See Marsh v. Oregon Natural Resources Council,* — U.S. ——, 109 S.Ct. 1851, 1859–60, 104 L.Ed.2d 377 (1989).

4. We may treat Judge Panner's decision as a judgment that the forest service's failure to prepare a supplemental EIS was not arbitrary and capricious. The reasonableness standard involves less deference to the agency than does the arbitrary and capricious standard. *Cf. Marsh v. Oregon Natural Resources Council,* 109 S.Ct. at 1859–60 (equating argument that reviewing court must make its own determination of reasonableness with contention that agency decision does not deserve deference afforded by arbitrary and capricous standard). A finding that the agency's decision meets the more rigorous reasonableness standard thus necessitates the conclusion that the agency decision was not arbitrary and capricious.

the respects alleged.[5] We choose, however, to ground our decision on the fact that the bark beetle attack and proposed timber sale were encompassed by the terms of the EIS and accompanying CMP[6] and thus did not constitute "significant new circumstances" requiring a supplemental EIS under 40 C.F.R. § 1502.9(c)(2)(ii).

The CMP specifically takes into account that insects and disease such as "Douglas Fir tussock moth, grasshoppers, western spruce, budworm, dwarf mistletoe, root diseases, *and bark beetle*" (emphasis added) are "integral parts" of the HCNRA and have "caused significant losses" in the HCNRA in the past. The CMP proposes to cope with unacceptable insect and disease outbreaks through prevention measures such as removal of infected trees, logging residue cleanup, and prescribed burning, and through other management activities consistent with the policies expressed by the CMP and with other environmental values.

The EIS provides the fullest explanation of the policies embodied in the CMP and thus establishes the current range of permissible responses to an insect outbreak. The EIS specifically states that accepted silvicultural (forest management) practices in dispersed recreation/timber management areas such as the Duck Creek area include "salvage." The glossary to the EIS defines salvage cutting as "removal of recently dead trees." The EIS further

---

**5.** Judge Panner did not commit error by holding that the EA affords adequate consideration to the effect of the timber sale on elk and other wildlife. As the EA points out, elk and wildlife will be affected by the bark beetle epidemic regardless of whether the timber sale takes place: The amount of dead and dying timber in the Duck Creek area reduces the coverage and forage available to elk and increases the amount of snag habitat present for nesting and shelter. The EA asserts that it is not possible to measure the additional impact any of the alternative timber sale plans would have on elk because "the migration corridor is wider than just the Duck Creek drainage, migration is time variable each season depending on weather conditions and forage readiness, and elk are moderately versatile with the ability to adapt to various habitat conditions and locations." The alternative selected by the EA and by Supervisor Richmond attempts to minimize any additional effect of the timber sale on elk by leaving in place the "stringers" used for elk migration and habitat. The EA further explains that all of the timber sale plans would maintain snags at the optimum level required by the CMP. The EA thus considers and attempts to mitigate any incremental effect the timber sale might have on elk and other wildlife.

Nor did Judge Panner err in holding that the EA affords sufficient consideration to the effect of the timber sale on water quality. It will become clear in our discussion of the Clean Water Act that the EA attempts to ensure that the sale will be consistent with Oregon water quality standards.

Judge Panner was also correct in finding that the EA studies adequately the cumulative effects of the sale. The EA includes an analysis of the cumulative effects of this sale on stream flow and, by requiring buffer zones and placing other restrictions on logging near streams, seeks to prevent other possible cumulative effects on water turbidity and temperature. The cumulative effect of the sale on timber in the HCNRA is explicitly permitted by the EIS because the sale volume counts toward allowable sale quantity in dispersed recreation/timber management areas.

Moreover, Judge Panner properly held that, although the EA is missing information with regard to the precise effect of the beetle infestation on water quality and elk migration, those gaps do not require a worst case analysis. The Supreme Court has recently held that uncertainty in protecting environmental harms does not require a worst case analysis. *See Robertson v. Methow Valley Citizens Council,* —— U.S. ——, 109 S.Ct. 1835, 1846–47, 104 L.Ed.2d 351 (1989).

Finally, the district court rightly found that the EA sufficiently considers the no-action alternative. The EA includes the no-action proposal in its list of alternative responses to the bark beetle epidemic and, in Section III, describes the environmental impact of that proposal as well as of the others. The fact that the description of the no-action alternative is shorter than those of the other proposals does not necessarily indicate that the no-action alternative was not considered seriously. It may only reveal that the forest service believed that the concept of a no-action plan was self-evident while the specific timber sale plans needed explanation.

**6.** The HCNRA Act designates the CMP as the authoritative document for purposes of determining permissible management activities in the HCNRA. *See* 16 U.S.C. § 460gg–5. It is thus appropriate to take the CMP into account when assessing the adequacy of the environmental analysis the forest service had in hand when it approved the Duck Creek timber sale. *See Southern Oregon Citizens v. Clark,* 720 F.2d 1475, 1480 (9th Cir.1983) ("[T]he label of the documents is unimportant. We review the sufficiency of the environmental analysis as a whole.").

specifies that the total potential timber yield of those areas in the dispersed recreation/timber management category is to be between five and nine million board feet annually. The CMP states that timber in these areas is to be considered part of the regulated component of the Wallowa–Whitman National Forest timber base.

The Duck Creek EA acknowledges and respects these restrictions on the amount of timber that may be cut from dispersed recreation/timber management areas. The proposed Duck Creek cut is of approximately six million board feet. The EA specifies that the sawlog volume removed from the Duck Creek area will count toward the allowable sale quantity and will postpone or defer cutting of equal amount of volume from other timber stands until a later date. In explaining his finding of no significant impact, Supervisor Richmond noted this specification and emphasized that the EIS and CMP had already made the decision to allow logging within environmental constraints in dispersed recreation/timber management areas.

In sum, the forest service prepared the EA in a context where an EIS and CMP had already contemplated serious bark beetle and timber sales of the type and magnitude proposed.[7] The beetle attack and timber sale, which explicitly respects the constraints imposed by the EIS and CMP on logging and dispersed recreation/timber management areas, thus did not constitute "significant new circumstances" requiring a supplemental EIS under 40 C.F.R. § 1502.9(c)(2)(ii). Cf. Preservation Coalition, Inc. v. Pierce, 667 F.2d at 861 ("[w]here a federal project conforms to existing land use patterns, zoning, or local plans, such conformity is evidence supporting a finding of no significant impact."). A reasoned evaluation of the Duck Creek timber sale was provided in general terms by the EIS and CMP and in terms more specific to the Duck Creek area by the EA. The forest service's decision not to prepare a supplemental EIS was well-grounded, not arbitrary and capricious. The timber sale complies with NEPA requirements.

## II  The Clean Water Act

■ The Clean Water Act, 33 U.S.C. § 1251 et seq., imposes restrictions on the degree to which pollutants may be permitted to affect Duck Creek. The CWA requires development of a state process to identify agricultural, silvicultural (forest management), and other nonpoint sources [8] of pollution and to set forth procedures and methods to control such sources. See 33 U.S.C. § 1288(b)(F)–(K). These state procedures are called "best management practices" ("BMP's"). The CWA also requires states to implement water quality standards with which federal agencies must comply. See 33 U.S.C. §§ 1313, 1323. Proper implementation of state-approved BMP's will constitute compliance with the CWA unless water quality monitoring reveals that the BMP's have permitted violation of these water quality standards. See Nonpoint Source Controls and Water Quality Standards, EPA Water Quality Standards Handbook, Chapter 2 at 2 (August 19, 1987).

Appellants contend that, despite its implementation of BMP's, the timber sale will violate the CWA, 33 U.S.C. § 1323, by increasing turbidity by more than the amount permitted by Oregon's water quality standards. Oregon requires that nonpoint sources of pollution not increase stream turbidity by more than ten percent above natural levels. See Or.Admin. Rule 340–41–765(2)(c). The district court rejected appellants' argument, finding that the testimony of Ken Hauter, hydrologist for the Wallowa–Whitman National Forest, did not establish that the sale would increase

---

**7.** The fact that the forest service prepared an EA in this context reveals the care with which it evaluated the environmental effects of the proposed action.

**8.** A "nonpoint source" is any source of water pollution or pollutants not associated with a discrete conveyance. It includes runoff from fields, forests, mining and construction activity. W. Rogers, Environmental Law 375 (1977). Nonpoint sources constitute a major source of pollutants in this country's waters. Oregon National Resources Council v. United States Forest Service, 834 F.2d 842, 849 (9th Cir.1987).

turbidity by more than ten percent. We review this finding for clear error.

Hauter's testimony on the timber sale's likely effect on turbidity is confused and confusing. Hauter declared that "[t]imber harvesting activities on the Duck Creek sale area will cause a turbidity increase of more than ten percent in one out of twenty samples, or five percent of the time...." And Hauter also testified that if, in the wake of the timber harvest, one were to examine the turbidity level of Duck Creek, "20 times randomly selected, completely unbiased, and one of those times you will see a turbidity increase." Counsel were not sure how to interpret Hauter's "1 out of 20" statements, and they subjected him to a good deal of questioning about them. Judge Panner chose to interpret Hauter's testimony as indicating that there is only a five percent chance that Duck Creek's turbidity will increase more than ten percent as a result of the timber sale.

We agree with appellants that Judge Panner's interpretation may not be correct. We find, however, that Judge Panner's ultimate conclusion that Hauter's testimony did not establish an impermissible turbidity increase is not clearly erroneous. If one reads the whole of Hauter's testimony two facts become apparent. First, Hauter intended to state not that he would expect to see a turbidity increase of more than ten percent in one out of twenty samplings of Duck Creek, but that he would not be surprised to see such an increase in one out of twenty samplings. Second, in response to questions by counsel, Hauter stated that he regarded his "1 out of 20" comment as "a quantitative measure that I use to say the chances are low ... it's essentially another way of saying the chances are low that turbidity would be occurring." Hauter also agreed that by making his "1 out of 20" remark he was essentially saying "that a scientist can really never be 100 percent certain of anything." It is thus apparent that Judge Panner did not err in

holding that Hauter's testimony did not establish that the timber sale would violate Oregon water quality standards and the CWA.

## III  *The Hells Canyon National Recreation Area Act*

Appellants allege that the timber sale violates the HCNRA Act in two respects. First, they state that section 8(f) of the Act limits timber harvesting to areas where such activity was occurring at the time of enactment. Second, they assert that section 10 of the Act compels the Secretary to promulgate regulations governing when, where, and how certain activities, including timber harvesting, may occur in the HCNRA.

■ The district court rejected both arguments. Judge Panner reasoned that if appellants' interpretation of section 8(f) were correct, the EIS and CMP would have violated the Act by permitting restricted timber cutting in the Duck Creek area. Finding that it was too late for appellants to challenge the EIS and plan, Judge Panner then held that appellants were barred from making their first argument. With respect to appellants' second contention, Judge Panner held that the Act did not require the Secretary to promulgate regulations, and, even if it did, appellants had not shown the need for such regulations. We review *de novo* the district court's interpretation of the HCNRA Act. *See Callejas v. McMahon,* 750 F.2d 729, 730 (9th Cir.1984).

■ We need not decide whether appellants' first contention is barred by failure to exhaust administrative remedies or by laches. Even if we did not find that it was too late for appellants to argue that section 8(f) prohibits timber harvesting in the Duck Creek area, they would not prevail on this issue. Section 8 is entitled "Management plan for recreation areas." 16 U.S.C. § 460gg–5. Section 8(f)[9] must thus be in-

9. Section 8(f) reads:
(f) Continuation of ongoing activities
    Such activities as are as compatible with the provisions of sections 460gg to 460gg–13 of

this title, but not limited to, timber harvesting by selective cutting, mining, and grazing may continue during development of the comprehensive management plan, at current levels of

terpreted as part of a Congressional effort to describe the process by which the CMP is to be developed, the issues it must consider, and what may occur in the HCNRA while the CMP is under preparation. If section 8(f) is read in the context of section 8 as a whole, it becomes evident that section 8(f) addresses only that period of time between passage of the Act and development of the CMP and is not relevant to the Duck Creek timber sale. Appellants argue that the legislative history of the Act supports their interpretation of section 8(f). Their arguments appear to have little force. Because the statute is clear on it face, however, we need not be concerned with legislative history in interpreting its scope. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978).

■ We now turn to appellants' second contention, that section 10 of the Act directs the Secretary to promulgate regulations governing certain activities, including timber harvesting, in the HCNRA. In the almost fourteen years since enactment of the HCNRA Act, the Secretary has not promulgated any rules and regulations. This court has concluded that it would not be consistent with the overall purpose of the HCNRA Act, protection of the HCNRA, to interpret section 10 as stripping the Secretary of his general regulatory authority over the HCNRA, leaving him without power to act until he promulgates regulations under section 10. *See United States v. Hells Canyon Guide Service*, 660 F.2d 735, 737–38 (9th Cir.1981). If other regulations already apply to an activity in the HCNRA, we will not view section 10 as invalidating those regulations and requiring the Secretary "to take an additional, in fact, a redundant, affirmative step before he would be able to take *any* action to protect an area placed under his supervision." *Id.* at 738.

■ Thus, the question we must answer is whether section 10 compels the

Secretary to promulgate the regulations it describes when those regulations would not be duplicative of other rules already in effect in the HCNRA. We respond to this question in the affirmative. The language and legislative history of section 10 clearly reveal an intent to create a mandatory duty to promulgate regulations in the specified categories.

Section 10 reads:

The Secretary shall promulgate, and may amend, such rules and regulations as he deems necessary to accomplish the purposes of section 460gg to 460gg–13 of this title. Such rules and regulations shall include, but are not limited to—

(a) standards for the use and development of privately owned property with the recreation area, which rules or regulations the Secretary may, to the extent he deems advisable, implement with the authorities delegated to him in section 460gg–6 of this title, and which may differ among the various parcels of land within the recreation area;

(b) standards and guidelines to insure the full protection and preservation of the historic, archeological, and paleontological resources in the recreation area;

(c) provision for the control of the use of motorized and mechanical equipment for transportation over, or alteration of, the surface of any Federal land within the recreation area;

(d) provision for the control of the use and number of motorized and nonmotorized river craft: *Provided,* That the use of such craft is hereby recognized as a valid use of the Snake River within the recreation area; and

(e) standards for such management, utilization, and disposal of natural resources on federally owned lands, including but not limited to, timber harvesting by selective cutting, mining, and grazing and the continuation of such existing uses and developments as are compatible with the provisions of sections 460gg to 460gg–13 of this title.

activity and in areas of such activity on December 31, 1975. Further, in development of the management plan, the Secretary shall give

full consideration to continuation of these ongoing activities in their respective areas.
16 U.S.C. § 460gg–5.

16 U.S.C. § 460gg–7. Judge Panner perceived the phrase "as he deems necessary" to indicate that section 10 leaves the decision regarding whether to issue regulations to the Secretary's discretion. We do not believe that, read as a whole, the language of the section supports this view. The first sentence directs the Secretary to promulgate regulations but seems to limit that mandate to rules the Secretary decides are necessary to accomplish the purposes of the Act. The second sentence, however, extends that mandate beyond the confines of the Secretary's discretion to specific types of regulations. This interpretation makes grammatical sense. In both the first and second sentences of section 10 the predicate nominative of the word "shall" is "rules and regulations": "shall" describes the Secretary's relationship to the regulations. *See Fernandez v. Brock,* 840 F.2d 622, 632 (9th Cir.1987) (The argument that 29 U.S.C. §§ 1053(b)(2)(C) and 1054(b)(3)(D) compel the Secretary of the Treasury to issue regulations makes little grammatical sense because the predicate nominative of the word "shall" in those sections is "period" rather than "regulations.").

Such legislative history as exists supports our interpretation of section 10. The House Report on the HCNRA Act states that section 10 "directs the Secretary to promulgate regulations needed to accomplish the intent of the legislation. Specific regulation are to include...." House Committee on Interior and Insular Affairs, H.R.Rep. No. 94–607, 94th Cong., 1st Sess. 12, *reprinted in* 1975 *U.S.Code Cong. & Admin. News* 2281, 2286. And the Senate Report, which summarizes section 10 by subsection rather than as a whole, also states that the Act "directs" the Secretary to promulgate the specified types of regulation. *See* S.R.Rep. No. 94–153, 94th Cong., 1st Sess. 8 (1975).

We thus find that section 10 compels the Secretary to promulgate nonduplicative regulations of the sort described by subsections 10(a) through 10(e). In addition, the Secretary has discretion to issue additional regulations that he deems necessary to accomplish the purposes of the Act. Section 10(e) mandates regulations for timber harvesting by selective cutting on federally owned lands. We therefore reverse the district court's ruling on the regulation issue and remand for issuance of an order directing the Secretary to promulgate the regulations required by section 10.

■ It is conceivable that had the regulations been issued they would have affected the Duck Creek timber sale. This fact would ordinarily cause us to ask the district court to determine whether the Secretary's failure to issue the relevant regulations requires that the Duck Creek sale be enjoined. Given that timber harvesting in the Duck Creek area resumed in late April, however, such a request might be pointless. We therefore ask the district judge to consider the necessity of an injunction only if the Duck Creek harvest has not been completed on the date this opinion is filed.

## IV *Attorneys' Fees*

■ ONRC seeks attorneys' fees under the Equal Access to Justice Act for both the underlying district court action and for this appeal. The EAJA provides that a court shall award attorneys' fees to a prevailing party in a civil action against the United States "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).

The terms of this statute entitle the ONRC to attorneys' fees. First, ONRC's success on the regulations issue renders it a "prevailing party" for purposes of the EAJA. *See Southern Oregon Citizens v. Clark,* 720 F.2d at 1481 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Second, we find no special circumstances that would render an award unjust. The litigation did not involve a close or novel question. *See Animal Lovers Volunteer Association, Inc. v. Carlucci,* 867 F.2d 1224, 1226 (9th Cir.1989) (citation omitted). Third, we hold that the government was not substantially justified in arguing that the Secretary did not have a duty to promulgate regulation under Sec-

tion 10 of the HCNRA Act. "Substantially justified" means more than merely being undeserving of sanctions for frivolousness. *Pierce v. Underwood*, —— U.S. ——, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). We will find the government's position to be substantially justified if it is " 'justified in substance or in the main'—that is, justified to a degree that would satisfy a reasonable person." *Id.* While the "as he deems necessary" language in Section 10 may at first glance make the government's position seem reasonable, when one reads beyond the first sentence of Section 10, one discovers that it is not. The district court's endorsement of the government's position is grounded on a limited reading of the statute (the district court's amended opinion quotes only the first sentence of Section 10) rather than on a belief that the statute read as a whole supports the government's position or is ambiguous. As we noted in deciding the merits of this issue, the language and legislative history of section 10 clearly reveal an intent to create a duty to promulgate regulations in the specified categories. ONRC has performed a public service by ensuring that the Secretary will fulfill the duties assigned him by section 10. *Cf. National Wildlife Federation v. Federal Energy Regulatory Commission*, 870 F.2d 542, 545–46 (9th Cir.1989) (noting significance of this fact in the EAJA context).

### CONCLUSION

We affirm that portion of the district court's opinion holding that the Duck Creek timber sale complies with the National Environmental Protection Act, the Clean Water Act, and section 8(f) of the Hells Canyon National Recreation Area Act. We reverse the district court's holding that section 10 of the Hells Canyon National Recreation Area Act does not compel the Secretary to issue the specified regulations. We remand for issuance of an order mandating the Secretary to promulgate these regulations and for determination, if appropriate, of whether the Secretary's failure to issue the relevant regulations requires that the Duck Creek sale be enjoined. On remand the district court shall also determine the amount of attorneys' fees to be awarded ONRC for the original district court action and for this appeal. Pursuant to the authority granted us by 28 U.S.C. § 2412(a), we hold that the United States shall bear the costs of this appeal.

AFFIRMED in part, REVERSED and REMANDED in part.

REINHARDT, Circuit Judge, concurring:

I join fully in Judge Trott's opinion. However, for the reasons set forth in Part III, I believe appellant's request for an emergency injunction should have been granted.