1000 FRIENDS OF OREGON; Hood River Valley Residents Committee, Inc.; and Friends of Mt. Hood, Plaintiffs,

v.

UNITED STATES FOREST SERVICE, an agency of the United States; and Mt. Hood Meadows, Oreg., Ltd., a limited partnership, Defendants.

Civ. No. 92–690–FR.

United States District Court, D. Oregon.

Oct. 6, 1992.

Neil S. Kagan, Portland, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Thomas C. Lee, Larry A. Brown, Asst. U.S. Attys., Owen L. Schmidt, Office of the General Counsel, U.S. Dept. of Agri., Portland, Or., for U.S. Forest Service.

Mark L. Cushing, Richard H. Allan, Ball, Janik & Novack, Portland, Or., for defendant Mt. Hood Meadows, Oreg., Ltd.

## OPINION

FRYE, District Judge:

The matters before the court are:

1) the motion of defendant United States Forest Service for summary judgment (# 42);

2) the motion of defendant Mt. Hood Meadows, Oreg., Ltd. for summary judgment (# 48); and

3) the motion of plaintiffs for summary judgment (# 50).

## UNDISPUTED FACTS

Mt. Hood Meadows, Oreg., Ltd. (Mt. Hood Meadows) has had a special permit from the United States Forest Service (the Forest Service) to operate the Mt. Hood Meadows ski area on the east slopes of Mt. Hood since 1966.

In 1978, the Forest Service prepared a Master Plan and Final Environmental Impact Statement (FEIS) for the development of the Mt. Hood Meadows ski area. In the 1978 Master Plan, the Forest Service contemplated the construction of a chairlift referred to in the FEIS as Lift # 9.

In March, 1988, Mt. Hood Meadows presented a proposal for a new Master Plan for development of the Mt. Hood Meadows ski area to the Forest Service. The proposal of Mt. Hood Meadows for a new Master Plan contained a number of projects, including Lift # 9 (hereinafter referred to as the Gulch Chairlift). Following an open and public environmental process, which lasted more than two years, the Forest Service completed the FEIS with regard to the proposal for a new Master Plan in early 1991. In May, 1991, the Forest Service issued a decision on the proposal for the new Master Plan and FEIS. That decision was appealed to and eventually reversed by the Regional Forester. Rather than delay the approval of the Gulch Chairlift while a new proposal for a Master Plan was completed, Mt. Hood Meadows proposed to proceed with construction of the Gulch Chairlift as an independently justified project under the 1978 Master Plan.

In May, 1992, the Forest Service completed a Gulch Chairlift Environmental Assessment (EA). The purpose of this EA was to analyze options for the installation of the proposed Gulch Chairlift. The proposed Gulch Chairlift was different from Lift # 9 included in the 1978 Master Plan and FEIS in the following ways: 1) the proposed Gulch Chairlift was 250 vertical feet higher than Lift # 9; and 2) the proposed Gulch Chairlift was a high speed, detachable, quadruple chairlift, while Lift # 9 was a fixed grip, double chairlift; and 3) the installation of the proposed Gulch Chairlift included the removal of the existing Texas Chairlift, which removal was not included in the 1978 FEIS.

In the EA, the Forest Service considered three alternative actions as follows:

1) Alternative No. 1—no action.

2) Alternative No. 2—replacing the existing Texas Chairlift with a detachable, quadruple chairlift which would be constructed along the liftline which had been designed for the 1978 Master Plan Lift # 9 conceptu-

al liftline. The bottom terminal would be placed at the same location delineated for the 1978 Master Plan Lift # 9. The top terminal, however, would be placed 250 vertical feet higher and 1,000 slope feet longer.

3) Alternative No. 3—constructing a fixed grip quadruple chairlift along the location proposed for the 1978 Master Plan Lift # 9 location. Under this alternative, the existing Texas chairlift would remain in place. See Administrative Record, pp. 366–68.

In Chapter II of the EA, the Forest Service describes each of the three alternative actions under consideration and discusses measures to mitigate environmental damage to resources, including visual resources, vegetation, soils, water resources, wildlife, cultural resources, recreation, transportation, geological hazards, and fire hazards.

In Chapters III and IV of the EA, the Forest Service describes the condition of the environment in and surrounding the project area and describes the effects of implementing each of the three alternative actions upon the physical and biological environment. In the EA, the Forest Service addresses the effects of each of the three alternative actions under consideration upon vegetation, soils, visual resources, water resources, and biological resources. In the EA, the Forest Service addresses the effects of the three alternative actions upon the human environment and other resources; compares the effects of the three alternative actions; and discusses the cumulative effects of each of the three alternative actions upon the environment.

In a subsequent Decision Notice dated May 14, 1992, the District Ranger found:

Based on the analysis and evaluation of alternatives described in the Environmental Assessment, it is my decision to select Alternative 2 for the installation of the Gulch chairlift. The Gulch chairlift is an approved chairlift in the 1978 Master Plan/FEIS for Mt. Hood Meadows Ski Area. Alternative 2 will provide for the installation of a detachable quad chairlift in an alignment to the west of the Texas chairlift and 250 feet higher on the mountain than originally described in the 1978 Master Plan/FEIS. The Texas lift will be removed after the Gulch chairlift completed one full operating season.

Public involvement conducted during the planning process included contact with interested individuals, organizations, and public agencies, in order to identify issues and concerns associated with the project. Scoping letters were sent out to invite public comment on the construction of the Gulch chairlift in the summer of 1991. Also, a public tour of the proposed project, together with other Mt. Hood Meadows projects, was conducted. 10 members of the public toured the Meadows' area and viewed the Gulch lift project. In February of 1992, a planning newsletter was went [sic] out again, inviting public comment on the Gulch lift. Prior to this, scoping was also conducted through the 1991 Master Plan/FEIS.

The comments recieved [sic] were used to formulate the project alternatives. Public notification through the Sprouts publication was also done in the winter 1992 issue. Six letters were recieved [sic] and five phone calls were received. Two meetings were held with the representatives of the Confederated Tribes of the Warm Springs. I carefully considered all the public responses while selecting the preferred alternative.

Alternative 2, option C was found to be most responsive to Forest Service management concerns, Mt. Hood Meadows operating needs, and issues raised by the public. Alternative 2 is consistent with the Mt. Hood National Forest Land and Resource Management Plan and the Forestwide Standards and Guidelines for A–11 Winter Recreation Areas. This Alternative will not impact wetlands, old growth forest stands, Pacific Yew trees or Spotted Owl habitat. Alternative 2 responds to the issues in the following manner:

1. Alternative 2 best meets the objectives and operating needs of Mt. Hood Meadows Ski Area and the public need

for enhanced recreational opportunity through the installation of a high capacity detachable quad chairlift. Unlike a conventional fixed grip lift, the chairs detach from the main haul rope when entering the terminals, which provides for easy loading and unloading at a rope speed of 200 feet per minute. After leaving the terminal, the chair attaches to the main haul rope which transports the passengers at speeds of up to 1,000 feet per minute, about twice that of a conventional chairlift. Due to the very slow load and unload speed characteristic of detachable lifts, this alternative would provide increased opportunity for the very young, elderly, or limited mobility skiers to use the lift for accessing the upper mountain.

2. Three options on top terminal design center on [the] issue of visual quality. All three options meet the Forest Plan Standard and Guideline of partial retention as viewed from key viewpoints. Option C best meets safety considerations and skier dispersal needs while minimizing impacts to the visual character of Mt. Hood.

3. Alternative 2 will have minor impacts on vegetation as a result of construction activities. Mitigation measures such as limited construction activities in the dry summer months, use of proper erosion control techniques, use of helicopters for construction and revegetation efforts are designed to reduce construction effects.

4. The East Fork of the Hood River will not be affected by alternative 2. A minor short-term increase in run-off and sedimentation has potential to occur from construction activities above treeline. These effects are expected to be minimized by the presence of well-drained alpine soils and the use of proper erosion control techniques.

5. Alternative 2 will result in habitat loss from the clearing of some trees, causing a slight reduction in local population of the wildlife species utilizing the forest and Krummholz habitat. No federally Threatened or Endangered species, or other species listed as Sensitive by the Forest Service are expected to be adversely affected and the project will have no impacts on fisheries.

Decision Notice and Finding of No Significant Impact, pp. 1–2 (Plaintiffs' Exhibit 9).

The District Ranger concluded that "[b]ased on the site-specific environmental analysis documented in the Environmental Assessment, I have determined that this is not a major Federal action that would significantly affect the quality of the human environment; therefore, an Environmental Impact Statement is not needed." *Id.* at 3.

The Decision Notice informed the public that "[o]rganizations or members of the general public may appeal this decision pursuant to 36 CFR 217." *Id.* The plaintiffs, three organizations concerned with the protection of Mt. Hood's natural resources, filed administrative appeals.

Mt. Hood Meadows was scheduled to begin construction of the Gulch Chairlift in early June. On June 3, 1992, the plaintiffs filed this action against the defendants, alleging that the decision of the defendants to approve construction of the Gulch Chairlift violates the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.* The plaintiffs sought a preliminary injunction enjoining the defendants from contracting for, permitting, approving or carrying out construction of the approved Gulch Chairlift prior to the completion of an EIS. On June 18, 1992, this court issued an opinion and order in which it concluded that a preliminary injunction was not proper because the plaintiffs had not shown that they were likely to prevail on their claim that the decision of the District Ranger made on May 14, 1992 that an EIS is not needed was arbitrary or capricious and that the balance of hardships did not favor the plaintiffs.

## CONTENTIONS OF THE PLAINTIFFS

The plaintiffs contend that the construction of the Gulch Chairlift will affect the environment in a significant manner and to

a significant extent not considered in the FEIS prepared in 1978; that the District Ranger violated the terms of the National Environmental Policy Act by failing to prepare an EIS in which the cumulative effects of the Gulch Chairlift, as well as the other proposals for the development of the new Master Plan currently being analyzed, are considered; and that the District Ranger is required to consider the Gulch Chairlift and the other proposed projects for the development of the Mt. Hood Meadows ski area in a new EIS.

The plaintiffs contend that the impacts of the construction of the Gulch Chairlift on biodiversity and the functioning of the ecosystem received little attention generally in 1978, and none in the 1978 FEIS. The plaintiffs contend that the Gulch Chairlift EA and the 1978 FEIS upon which the Gulch Chairlift EA is dependent fail to adequately address the importance of biodiversity to the functioning of the ecosystem. The plaintiffs contend that alpine plant communities represent extremely important reservoirs of biological diversity and that the Forest Service has not adequately considered the effects of the loss of these alpine plant communities or the cumulative effects of the loss of these alpine plant communities when added to the significant past development of the area. The plaintiffs specifically rely upon the letter of Forest Service Ecologist Nancy Diaz to support their claim that the Forest Service has not adequately considered the effects of further loss of alpine plant communities.

In the second claim for relief, the plaintiffs contend that the District Ranger has failed to establish compliance with the National Forest Management Act.

## CONTENTIONS OF THE DEFENDANTS

The Forest Service and Mt. Hood Meadows contend that the decision of the Forest Service not to prepare an EIS was not arbitrary and capricious and that the defendants are entitled to an order of summary judgment in their favor.

The Forest Service argues that the EA and the finding of "no significant impact" is properly tiered to the 1978 FEIS and the 1991 EIS. The Forest Service argues that the record shows that it took a "hard look" at the environmental consequences of the Gulch Chairlift and reasonably decided that the proposed action would not significantly affect the environment in a manner or to an extent not considered by the 1978 FEIS. The Forest Service contends that the Gulch Chairlift has independent utility, is a stand-alone project, and can be built without a new Master Plan and EIS.

The Forest Service and Mt. Hood Meadows assert that the impacts on the environment of the construction of the Gulch Chairlift are minimal and do not require any further study. The Forest Service describes the impacts of the construction of the Gulch Chairlift upon water quality and trees cut as adequately addressed. The Forest Service contends that these impacts do not amount to an impact on the quality of the environment that is significantly greater than that predicted in the 1978 FEIS.

In addition, the Forest Service contends that the Gulch Chairlift is consistent with the Forest Plan and does not violate the terms of the National Forest Management Act.

## APPLICABLE STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact.

■ Once the initial burden of the moving party is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The non-moving party must make a sufficient showing on all essential elements of the case with respect to which the non-moving party has the burden of proof. *Id.*

■ The decision faced by the court is essentially the same decision faced by a

court on a motion for a directed verdict—that is, whether the evidence on the motion for summary judgment presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If reasonable minds could differ as to the conclusions drawn from the evidence in the record, the motion for summary judgment should be denied. *Id.*

## APPLICABLE LAW

■ The Administrative Procedures Act states that "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. Judicial review of agency action must be based on "the 'whole record' compiled by the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). The focus of judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

■ The court may consider evidence outside the administrative record to determine whether the conduct of an agency was insufficient or inadequate. *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir.1988), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989). However, in this case, the conduct of the Forest Service in preparing the EA in May, 1992 is not at issue. The court will make its review on the record as a whole.

■ The National Environmental Policy Act requires federal agencies to "include in every recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment, a detailed statement ... on (i) the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). Even after a federal agency has approved a proposal, that agency has a continuing duty to take a "hard look" at the environmental impacts of its planned action. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989). When significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact arises, the agency must prepare a supplemental EIS. *Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417, 1421 (9th Cir.1989).

■ The role of the EA is to "provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). Courts must uphold an agency determination that a supplemental EIS is not required if that determination is not *arbitrary or capricious.* The decision not to prepare a supplemental EIS will not be considered arbitrary or capricious if it appears from the record that the agency has based its decision on a reasoned evaluation of the relevant factors. *See Lyng*, 882 F.2d at 1422 (emphasis added).

In *LaFlamme v. Federal Energy Regulatory Comm'n*, 945 F.2d 1124, 1128–29 (9th Cir.1991), the court stated:

> We review the Commission's decision not to prepare an EIS by considering whether it reasonably concluded that the Project would have no significant adverse environmental consequences. We must defer to the Commission's judgment so long as we can be sure that it is fully informed and well-considered.

*Id.* (internal quotation marks and citation omitted).

The decision of record to allow the construction of the Gulch Chairlift as described in Alternative 2 of the EA was made on the basis of the EA and the underlying EIS. This is the process of "tiering" defined in the federal regulations as follows:

> "Tiering" refers to the coverage of general matters in broader environmental impact statements ... with subsequent narrower statements or environmental analyses.... Tiering is appropriate when the sequence of statements or analyses is ... [f]rom a ... program, plan, or policy statement or analysis of

lesser scope or to a site-specific statement or analysis.

40 C.F.R. § 1508.28–1508.28(a). Tiering in this manner has been upheld by the United States Court of Appeals for the Ninth Circuit. *See Lyng*, 882 F.2d .1417, 1422–24 (9th Cir:1989).

### ANALYSIS

On September 17, 1991, Nancy Diaz, the ecologist for Area 7, wrote a letter to the District Ranger, Hood River Ranger District, in which Diaz stated:

On September 4, Dean Apostol and I accompanied Dave Ozawa to sites of several proposed projects in the Mt. Hood Meadows Ski Area. Dave had asked for some input from Dean and I on questions that had arisen associated with planning for the projects. What follows is a summary of my comments and recommendations. Dean will respond in a separate memo.

Before I discuss individual project proposals, there is one concern that arises in several of them which I will address here: ground disturbance/modification of alpine vegetation (plant communities above treeline and in the transition zone between forest and non-forest) in general. I'm sure you are aware that the issue of biological diversity is taking on increasing visibility, and is more frequently being used as a criterion by our citizen owners for evaluation of our projects. What is becoming increasingly evident is that the concern is not only for unique, rare or special individual species, but also unique, special or rare COMMUNITIES of plants, or vegetation types. Alpine communities constitute an extremely important part of the total vegetative diversity on the Forest, both in biological terms and with respect to human values. Of all the types of vegetation that occur on the Forest, I would guess old growth, alpine and riparian-wetland communities are the ones people feel the most protective of. In terms of acreage, the alpine component, especially the whitebark pine islands and alpine wetlands, is a minute proportion of the total Forest (I am currently in the process of trying to map various alpine community types so we can quantitatively assess project effects on the alpine zone as a whole). Biologically, alpine areas rank with wetlands as contributing a great amount of species- and community-level diversity. So, we have a very small amount of a very important resource, and as such should have VERY compelling reasons for causing further reductions in acreage or ecological function.

For this reason, in order to maintain a defensible position I strongly advise: 1) minimizing destruction of alpine vegetation wherever possible and 2) full analysis and disclosure of proposals to disturb alpine vegetation, ALL projects being taken into account, AND cumulative effects to alpine vegetation addressed. It will also be important to take into consideration that a significant proportion of alpine vegetation has ALREADY been removed from the land base by projects within the Ski Area. The projects that are currently being proposed taken collectively have extensive impacts to alpine and subalpine plant communities. To carry them out in a piecemeal approach, apart from the phased development plan and disclosure (as promised in the ROD) I fear will limit our ability to address the critical points of the diversity issue. I also fear it will further erode our credibility, by giving the appearance of lack of understanding of [the] issue of landscape level community/habitat biodiversity, and lack of appreciation of the significant aesthetic/social values of alpine vegetation. Even though I don't believe this is true of us either as individuals or as an organization, I think it is likely to be the perception.

Administrative Record, p. 681.

This letter of Nancy Diaz was considered in the record and concerned a road project that was subsequently eliminated as well as several other actions that were then proposed under the new Master Plan. The Forest Service has carried out the recommendations made by Diaz to minimize the impact to alpine vegetation, to make full

disclosure, and to make a cumulative impact analysis for alpine vegetation.

■ The record is adequate to support the position of the Forest Service that it took a "hard look" at the environmental consequences of the construction of the Gulch Chairlift and reasonably concluded that the construction of the Gulch Chairlift proposed in Alternative 2 would have no significant environmental impact, individually or cumulatively, beyond what had been analysed in the FEIS. The impacts upon vegetative communities were considered; the cumulative effects upon the vegetative communities of the proposed alternatives were evaluated; and measures in mitigation of these effects were required.

The specific concerns discussed by Nancy Diaz are in reference to projects other than the Gulch Chairlift and do not apply to the evaluation of this case. The general concerns discussed by Diaz as to the loss of subalpine communities are taken into account in the mitigation measures required by the Forest Service. A general discussion of environmental concerns by an employee of the Forest Service such as Diaz does not require that the Forest Service take no further action in the area which is of concern. Agency personnel must be free to raise general concerns on environmental issues. An open discussion of general concerns does not substitute for a reasoned analysis of a specific proposed action.

The court concludes that the actions of the Forest Service were based upon a reasoned evaluation of the relevant factors and that the decision not to prepare an EIS was not an arbitrary or a capricious decision.

### CONCLUSION

1) The motion of the Forest Service for summary judgment (# 42) is granted;

2) the motion of Mt. Hood Meadows for summary judgment (# 48) is granted; and

3) the motion of plaintiffs for summary judgment (# 50) is denied.

The court will file a judgment in favor of the defendants and against the plaintiffs on this date.