Stew and Mary Jo
**CHURCHWELL, Plaintiffs,**

v.

**F. Dale ROBERTSON, J.S. Tixier, and Jack C. Griswold, Defendants.**

**No. 90–0289–E–EJL.**

United States District Court,
D. Idaho.

Oct. 4, 1990.

Eleanore S. Baxendale, Givens, Pursley, Webb & Huntley, Boise, Idaho, for plaintiffs.

Marc D. Haws, Asst. U.S. Atty., Boise, Idaho, for defendants.

## MEMORANDUM DECISION

LODGE, District Judge.

Before the Court is the plaintiffs' motion to enjoin the Forest Service from proceeding with the proposed Sawmill Creek Timber Sale. Plaintiffs filed their complaint for injunctive relief on May 31, 1990 and a hearing was held on June 29, 1990. At the conclusion of the hearing, the Court took the matter under advisement. Plaintiffs then moved for a temporary restraining order to prohibit implementation of the proposed sale pending a decision. The government responded with a pledge not to proceed with the bidding process until the Court's decision had been rendered, and the plaintiffs withdrew their motion for a T.R.O.

The Forest Service wishes to proceed with a timber sale in the Challis National Forest, called the Sawmill Creek Timber Sale in the Sawmill Creek drainage area, which is a part of the larger Morgan Creek drainage area. The purpose of the timber sale is the implementation of a silvicultural prescription cut to eradicate a dwarf mistletoe infestation. Plaintiffs own property in

the Sawmill Creek drainage area adjacent to the proposed sale site, and seek a preliminary injunction barring the Forest Service from going forward with the sale. Plaintiffs have alleged violations of the National Environmental Policy Act—42 U.S.C. §§ 4321, et seq. (NEPA); the National Forest Management Act—16 U.S.C. §§ 1601, et seq. (NFMA); and the Administrative Procedure Act—5 U.S.C. §§ 702, et seq. (APA). Plaintiffs have also filed a motion to strike certain affidavits and portions of affidavits submitted by the government in advance of the hearing.

## BACKGROUND

The Churchwells and representatives of the Forest Service serving in the Challis National Forest have been involved in a relationship which began at least as early as the summer of 1985. Discussions of issues regarding the proposed logging activities in the Sawmill Creek area provide the central structure upon which this relationship has been built. The core of the issues involve water, roads, and noise. Other issues related to these three drift in and out as do unrelated issues, however, over the past five years water, roads, and noise, particularly water and roads have dominated the relationship.

The answers to the questions posed in this litigation lie in the interplay between the actions of the agents of the Challis National Forest and the various guidelines, both national and those generated within the Challis National Forest itself, which are intended to give direction to these actions and control future activity in the Challis National Forest.

The Challis National Forest is administered according to the Challis National Forest Land and Resource Management Plan (the Plan).[1] The Plan and its attendant Environmental Impact Statement were filed with the Environmental Protection Agency and made available for public inspection and comment on July 26, 1985, and were approved in a Record of Decision (ROD) dated June 3, 1987.[2] The ROD was signed by defendant, J.S. Tixier, Regional Forester. The Plan was developed according to the principals enunciated in the Multiple–Use and Sustained Yield Act of 1960 (MUSYA), 16 U.S.C. § 528 et seq.; NEPA; the Forest Rangeland Renewable Resources Planning Act (RPA) of 1974, 16 U.S.C. §§ 580n and 1601 et seq.; and NFMA.[3]

The purpose of the Plan is to "direct all natural resource management activities and establish management standards and guidelines for the Challis National Forest. It describes resource management practices, levels of resource production and management, and the availability and suitability of lands for resource management."[4]

At page II–35, the Plan discusses forest problems caused by insects and diseases, including dwarf mistletoe. Dwarf mistletoe infestation results in higher tree mortality, reduced growth, loss of wood product quality, and higher susceptibility to rots and blow down. Low harvest levels do not significantly control the dwarf mistletoe problem. "At present harvest levels, timber stands can be expected to decline in vigor and growth. The greater amount of timber in older age classes will contribute to the decadence of stands. Forest insects and diseases will become a greater factor in causing stand mortality with net growth continuing to decline. Wildfire risk will become greater from the additional fuels loading generated by the unmanaged stands." It is predicted that "insect and disease potential will decline on managed lands [managed through timber harvest] throughout the planning period."[5]

The Plan mandates that water quality is to meet State water quality standards. These standards are to be met by application of the State's "Best Management Practices" to all management induced activities. The "R–4 Technical Guide to Erosion Con-

---

**1.** Administrative Record Document No. 000008.

**2.** Administrative Record Document No. 000006.

**3.** Plan Preface.

**4.** Plan at Page I–1.

**5.** Plan, at page IV–37.

trol on Timber Sale Areas" is to be used as a guideline for all timber sales and road construction. The Plan requires that Forest activities will not increase fine sediment (depth fines) by more than two percent over existing levels, not to exceed 30%.[6]

The Plan is replete with references to timber sales. In the Management Prescription for Management Area #21, the area within which the proposed sale site is contained, one of the goals is to "Emphasize the management of the most productive and accessible forest lands for timber production."[7] An estimated 12,550 acres of Douglas Fir and lodgepole pine are deemed suitable for commercial timber production in area 21.[8]

The Plan calls for a tiered system within the Challis National Forest and requires that all future activities on land within the Forest be carried out in a manner consistent with the Plan.[9] Site-specific activities are built upon this Plan foundation.[10] The Plan, because it is the general, overall, management guide for the entire Forest, does not include any site-specific decisions. As stated in the ROD, it is contemplated that site-specific activities, such as the Sawmill Creek Timber Sale, will be governed by site-specific decisions. Dissatisfaction with site-specific decisions should be expressed through an appeal of site-specific decisions, not through an attack on the entire Plan.[11]

The Sawmill Creek Timber Sale is based on the Sawmill Creek Environmental Assessment (EA) Supplement[12] which is tiered on the Morgan Creek EA,[13] and Stephen's Creek EA[14] which are tiered on the Plan and the Plan's management prescription for Management Area #21, and the Final Environmental Impact Statement[15] (FEIS).

The Stephen's Creek EA was approved on February 28, 1983, and peripherally involved issues regarding the Sawmill Creek Sale. While dwarf Mistletoe was not yet a great problem in the Stephen's Creek area when this EA was prepared, the EA references the severe dwarf mistletoe problem in the Sawmill Creek area. The EA also states that the dwarf mistletoe problem will only increase, and while the effects of mistletoe are very damaging, when combined with the damage from the Western Douglas-fir beetle which follows the mistletoe, the effects on the forest are devastating. The prescription calls for harvest of those trees infected with dwarf mistletoe before the problem gets out of hand and approaches the level of Sawmill Creek. Other concerns were the maintenance of water quality in Stephen's Creek and Sawmill Creek. The EA also documented attempts to lessen or mitigate the damage which would result from the sale.

After release of the Stephen's Creek EA, but before release of the Morgan Creek EA, sometime in early 1985, the Churchwells moved to their present location.[16] The relationship between the Churchwells and various employees of the Forest Ser-

---

**6.** Plan at page IV–20–22.

**7.** Plan at page IV–168.

**8.** Plan at page IV–170.

**9.** Plan at page V–1.

**10.** The tiering system is designed to allow incorporation of Plan guidelines, or other guidelines of a nature which are broader than those found in the site-specific documents within the various tier, to be incorporated into site-specific discussions by reference. Incorporation by reference reduces duplication and facilitates more thorough discussion of the particular areas of concern to the site-specific activity. 40 C.F.R. §§ 1502.20, 1502.21, and 1508.28.

**11.** Administrative Record Document No. 000006, at p. 24.

**12.** Administrative Record Document Nos. 000200–000238.

**13.** Administrative Record Document Nos. 001123–001145.

**14.** Administrative Record Document Nos. 001176–001220.

**15.** Administrative Record Document No. 000009.

**16.** Exhibit A to Mary Joe Churchwell Affidavit of June 22, 1990.

vice began shortly thereafter.[17]

Sharon Bradley first met the plaintiffs in the early summer of 1985 at her office. The plaintiffs expressed concern regarding increased noise, trespass, and diminution to their property value as a result of the proposed timber cuts in the Morgan Creek drainage area. This was the first of at least thirteen separate meetings, many of which were held on the plaintiffs' property. Some of these meetings involved as many as six separate Forest Service employees. The plaintiffs were kept apprised of developments regarding the Sawmill Creek sale and were even given an explanation of the appeals process. The Forest Service actively sought input and comments from the plaintiffs, and the plaintiffs actively pursued their concerns. In addition to the face to face meetings, a great deal of communication was done through written correspondence.

Three letters from the Churchwells were summarized in a document entitled "Sawmill/Stephen's Creek Proposed Sale Issues Presented by the Churchwells from Documents dated September 10, 1986, October 10, 1986 and October 18, 1986,"[18] prepared by Forest Service personnel:

1) impact on quality and quantity of water in Sawmill Creek—the source of the Churchwells' household water supply;

2) disturbance of peace and beauty of the area;

3) impact on the elk calving area;

4) impact on other wildlife;

5) disturbance of archeological site by logging roads;

6) safety hazard to Churchwell children from logging operation;

7) damage to buildings and fences from logging;

8) increased fire danger to home;

9) reduction of property values;

10) noise disturbance;

11) logging is not the best use for the area;

12) use of roads after logging might continue even though the roads are scheduled to be closed; and

13) objection to cutting methods.

On March 6, 1987, a Decision Notice/Finding of No Significant Impact (DN/FONSI)[19] was issued by the Challis National Forest with regard to the Morgan Creek Drainage Timber Resource Management proposal. A copy was sent to the Churchwells.[20] According to this DN/FONSI, resource management activities in the Morgan Creek Drainage include road construction and tree harvesting. Of six resource management proposals, alternative V was chosen. This alternative includes treatment of timber stands in the Sawmill Creek drainage according to silvicultural requirements. The DN/FONSI was based on consideration of the following factors:

1) Best meets the management goals and objectives for the area, as documented in the Forest Plan;

2) There will be no irretrievable loss of timber production nor irreversible resource commitments;

3) No known unique or endangered resource will be disturbed;

4) There will be no adverse effects to minority or socio-economic groups; and

5) There will be no adverse effects to wetlands or floodplains.

The DN/FONSI further found, based on the EA, "that there will not be a significant impact on natural or human environments; consequently, an Environmental Impact Statement will not be prepared." 42 U.S.C. § 4332. Finally, the DN/FONSI noted

---

17. The history of the relationship between the Churchwells and employees of the Forest Service was compiled from the declarations of Robert S. Gardner, the District Ranger, Challis National Forest; Sharon S. Bradley, Forest Silviculturist and Forest Sale Inspector for the Challis National Forest; and from various documents contained within the Administrative Record.

18. Administrative Record Document Nos. 000533–000536.

19. Administrative Record Document No. 000239.

20. Declaration of Sharon Bradley, Paragraph 23.

that the proposed actions were within the guidelines established in the proposed Plan.

According to the Morgan Creek EA, the primary purpose for the timber harvest is the "treatment and control of dwarf mistletoe both in Douglas Fir and lodgepole pine." Other objectives, as outlined in the EA, include reduction of sediment levels by closure of some deteriorating roads and relocation/reconstruction of existing roads; observance of the 2%/30% depth fines levels; application of R–4 technical guidelines for erosion control; avoidance of conflicts with private landowners; consideration of the visual impacts of activities; closure of roads in the Sawmill Creek area; and restriction of cuts in the Sawmill Creek area to provide for stream protection.

Plaintiffs never appealed the DN/FONSI on the Morgan Creek Sale.[21]

On June 14, 1987, the Churchwells appealed the June 3, 1987, ROD approving the Plan and the FEIS. They raised the same issues they had been discussing with the Forest Service for two years.[22]

The Churchwells' concerns were addressed, item for item, following the same format in which they were raised by the Churchwells, in the Forest Service's Responsive Statement dated March 30, 1988.[23] They were again raised and discussed in the Churchwells' "Reply to Responsive Statement." [24]

While the appeal was still pending, on July 14, 1988, defendant, Jack Griswold, Forest Supervisor for the Challis National Forest, wrote to respond to questions posed by the Churchwells to Forest Service personnel at a July 6, 1988, meeting at the Churchwells' home.[25] Griswold addressed procedural aspects of the appeals process; the procedural process for securing a stay of logging activities; and outlined 14 points of concern raised by the Churchwells regarding logging activity in the Sawmill Creek Area, the same core of concerns that have been at issue throughout. Griswold informed the Churchwells that they intended to work up a supplement to the Morgan Creek EA to address their concerns.

On October 24, 1988, the Churchwells' Plan ROD appeal was denied because it was overly site-specific.[26]

On May 1, 1989, defendant Griswold, issued the DN/FONSI for the Sawmill Creek Timber Sale. The DN/FONSI notes that it is tiered to both the Plan and the FEIS and the Morgan Creek EA.

It notes that the sale was determined to be consistent with the Plan and applicable federal law, and that the proposed sale was "not a major federal action that would significantly affect the quality of the human environment."

An EA supplement was appended to the Sawmill Creek DN/FONSI. This supplement was drafted to address the concerns of the Churchwells with regard to the Sawmill Creek sale.[27] According to the Sawmill Creek EA, "the purpose of this timber sale is to treat silviculturally mature and overmature Douglas–Fir. At least 70% of the Douglas–Fir is heavily infected with Douglas–Fir Mistletoe." [28]

In the Sawmill Creek EA [29] ten issues and concerns were listed:

1) Water yield—Sawmill Creek;

2) water quality—Sawmill Creek;

---

21. Declaration, Sharon Bradley, Paragraph 24.

22. See footnote 18, *supra,* and accompanying text.

23. Administrative Record Document Nos. 000817–000844.

24. Administrative Record Document Nos. 000032–000036.

25. Exhibit A to Gardner Declaration.

26. As noted in Griswold's letter, the issues raised in the appeal were attacks on the Morgan

Creek DN/FONSI and EA, not the Plan and FEIS. In the decision denying their appeal, the Churchwells' concerns were addressed in terms of the general application of the plan.

27. *See* Exhibit A to Declaration of Robert Gardner. *See also,* The Sawmill Creek EA Supplement pp 19–20, Administrative Record Document Nos. 000219–000220.

28. Administrative Record Document No. 000202.

29. Administrative Record Document Nos. 000200–000238.

3) public safety, protection of private improvements;

4) new road construction;

5) visuals;

6) reforestation, timber quality;

8) Taylor Mountain roadless area;

9) subsidized logging; and

10) noise.

This is the Churchwells' list. Each item received extensive attention and analysis, as they did in the Morgan Creek EA and, to a lesser extent in the Stephen's Creek EA.

Three alternative courses of action for the area were analyzed:

1. no action;

2. maximize the salvage of timber; and

3. salvage timber, while also minimizing impacts to other resource concerns.

Plan standards and guidelines regarding recreation, wildlife and fish, soil, water, air, lands, and facilities (roads) are incorporated into alternatives 2 and 3. Alternative 1 does not comply with the Plan because it does not integrate forest pest management into timber management.

Alternative 2 is a straight ahead sale. Its primary focus is the harvest of timber. The concerns of the Churchwells are ignored. Alternative 3 seeks to harvest the maximum amount of diseased timber as well, but seeks to conduct the harvest in a manner which will impact the Churchwells in as minimal a fashion as possible while still attempting to comply with the silvicultural prescription.

Alternative 3 incorporates the following mitigation measures[30] which were designed to lessen the impact of the timber sale on the Churchwells:

1. New roads and old logging roads will be "administratively closed" during logging activities to protect wildlife, reduce sedimentation, and minimize impacts on fisheries and the watershed. The public will be kept off these roads during and after logging. Public access will be prohibited to protect public safety and reduce traffic to keep down wear and tear and the resultant negative impact on wildlife and water. Immediately following construction, the road slopes will be seeded to promote new growth and cut down on erosion and the resultant sedimentation.[31] Upon completion of the logging activity, the roads will be obliterated by providing drainage, construction of barriers, and a second reseeding;[32]

2. The boundaries of the cut units will be moved to shorten the windward length of the units. This will alter the snow dispersal, avoid increased evaporation and accelerated spring run-off, decrease sedimentation during run-off periods, and leave water-yields throughout the year at natural levels.[33] This eliminated 60 acres of proposed harvest in the area closest to the Churchwells' property, cut the amount of the total harvest by 40,500 board feet, and eliminated the need to construct 1.8 miles of new roads to access these 60 acres.[34] This will reduce sedimentation, preclude the possibility of motorized access, reduce noise, reduce impairment of visual quality, and provide a larger buffer area between the Churchwells and the logging activity;

3. The use of a selective harvest technique which will result in a mosaic forest effect as opposed to a clear-cut will also aid in the maintenance of water yields at natural levels;

4. Logging activities will be prohibited from May 1 through June 30 during each year of the sale. This protects wildlife during elk calving and deer fawning and eliminates activities during the spring run-off period to further reduce the potential for sedimentation;

---

**30.** Administrative Record Document Nos. 000211–000212.

**31.** The Churchwells requested permission to drive these roads to monitor the logging activities. This request was denied. Declaration of Sharon Bradley, Paragraph 51.

**32.** Administrative Record Document No. 000212. *See also* Declaration of Robert Gardner, Paragraph 18.

**33.** *Id. See also* Affidavit of Roland Leiby and Declaration of Peter Stender.

**34.** Declaration of Robert Gardner, Paragraph 18.

5. Logging activity will be allowed in only two units at any one time. This concentrates activities for both wildlife and water quality protection. Three of the seven units are also scheduled for priority treatment to mitigate sedimentation delivery;

6. Firebreaks will be constructed on those units closest to the Churchwells' property to protect against the risk of fire; and

7. Throughout the course of the logging activity, the sale will be monitored to ensure the BMPs are being property implemented. Additionally, the Forest Service Hydrologists will monitor water quality throughout the sale. The results of the water quality monitoring will be used to alter logging activities if necessary.[35]

Roland Lieby, Forest Service Hydrologist, whose involvement with monitoring and testing water in the Sawmill Creek area with the R1/R4 sediment model began in the fall of 1986, has stated that the logging activities—with the mitigation measures and BMPs implemented—will have no significant effect on water quality in the area. As to water yield, specifically in Sawmill Creek—the source of the Churchwells' domestic water supply—any variation in the amount of water in Sawmill Creek would be "essentially undetectable." [36] The methods used by Lieby, and the conclusions reached based on these methods were analyzed by Peter Stender, the Regional Hydrologist for the Forest Service in the Intermountain Region. He approves of Lieby's methods and analysis. He supports Lieby's conclusions and agrees with the DN/FONSI for the Sawmill Creek Sale.[37]

J. Timothy Kennedy is a Private Forest Specialist with the Idaho Department of Lands. He was first alerted to water issues regarding the Sawmill Creek Sale by the Churchwells. He analyzed the proposed sale and concluded, based on the layout as discussed in the Sawmill Creek EA Supplement, the applicable Idaho regulations have been complied with; wildlife will be protected; erosion potential is low; the logging activities and road construction will have little impact on water quality; and the Churchwell's water supply should not be affected.[38]

In their present complaint for injunctive relief the Churchwells allege the following:

1) the EA does not comply with the Plan on
   a) sedimentation standards; and
   b) new road construction;

2) the EA does not consider cumulative impacts:
   a) insufficient consideration of sediment;
   b) no consideration of increased road mileage;
   c) no consideration of wider impact on Morgan Creek, Management Area 21, and the forest as a whole;

3) the EA does not have an effective "No–Action Alternative";

4) the EA failed to take a hard look at other effects:
   a) the Churchwells' domestic water source; and
   b) noise; and

5) the EA failed to provide adequate justification for "subsidized logging."

## JURISDICTION

This Court has jurisdiction under applicable sections of the NEPA, NFMA, and APA statutes. Both parties and the Court agree. The jurisdiction of this Court to decide this matter is not at issue.

---

35. Road location and construction, and reforestation were again discussed in defendant, Jack C. Griswold's, October 2, 1989, response to the Churchwells' request for more information. Administrative Record Document Nos. 000896–000947.

36. Affidavit of Roland Lieby.

37. Declaration of Peter J. Stender.

38. Declaration of J. Timothy Kennedy. Kennedy notes that the road choice of the Forest Service to gain access the sale, instead of using the road the Churchwells use, is the best choice, because the road the Churchwells presently use is too close to Sawmill Creek and is in part of the Riparian Zone.

## STANDING

■ The government has raised an objection to plaintiffs' standing to pursue their attack on the "subsidized logging" issue and the impact of alleged increased sediment on fisheries.

In the Churchwells' NFMA complaint, they allege the sale is objectionable because it is a "below-cost" sale, i.e., that it represents an inefficient use of taxpayer funds and resources. The injury which would result from a below cost sale is a depletion of the federal coffers, or, at least, no increase. They also allege increased sediment from logging activities will have a negative effect on anadromous fisheries located on lower Morgan Creek. These alleged injuries are general injuries, injuries which would afflict all federal taxpayers, not just the Churchwells. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 220–21, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974). The Churchwells, in order to have standing to pursue these issues, must allege a "personal stake in the outcome." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). This, plaintiffs have failed to do.[39]

Therefore, plaintiffs' complaint for injunctive relief, to the extent it is based on NFMA, economic, taxpayer allegations with regard to "subsidized logging," and in so far as it alleges injury to anadromous fisheries, is dismissed.

## MOTION TO STRIKE AFFIDAVITS

On June 29, 1990, the plaintiffs filed a motion to strike the affidavits of Peter Stender, Ronald Hamilton, Roland Lieby, J. Timothy Kennedy, and portions of the affidavit of Robert C. Gardner. The basis for their motion is that the consideration of this Court in analyzing the decision of the agency in issuing its DN/FONSI should be limited to the record which was in existence before the agency. To the extent the new affidavits add to that record they should be stricken.

■ Judicial review of action taken by an agency is limited to review of the record which was before the agency, and the record of the agency's proceedings on the

---

**39.** The court notes for the record, as concerns the subsidized logging issue, that were the Churchwells determined to have standing to pursue this matter, they would have virtually no chance for success on the merits. The Challis National Forest is administered for multiple use pursuant to the Multiple–Use and Sustained Yield Act. 16 U.S.C. §§ 528 et seq., specifically, 16 U.S.C. § 531(a) and (b). One aspect of the multiple use scheme is timber production and harvest. 16 U.S.C. §§ 1604 and 1613 and 36 C.F.R. § 219.14(b). Under these statutes, long term goals and plans regarding multiple use and timber harvest are to be developed and followed. A simplistic, unidimentional approach to such complex decisions, such as the amount of profit to the United States as a result of any timber sale, is neither realistic nor particularly helpful in light of the statutory scheme and the many competing interests and necessities of the forest.

This proposed sale is a particularly good example of the necessity for broader consideration. The initial interest of the Forest Service in this sale is the eradication of a dwarf mistletoe infestation in Douglas Fir. Over 70% of the Douglas Fir in the proposed cut areas are infested with this disease. Due to the properties of the mistletoe, and the manner in which it is spread, this percentage can only be expected to increase over time. The disease, because of the destruction of healthy trees, and the infestation with bark beetles which follows once the trees weaken, can result in the ruination of an entire forest. This creates a greatly increased risk of fire and, without healthy trees to speed regeneration, decreases the rate at which the forest rebounds. The Churchwells have expressed the concern that the logging activities will increase the risk of fire on their property. The evidence suggests the opposite: the logging operation will serve to reduce the risk of fire in the area through the elimination of dead and dying trees.

Clearly, something has to be done to thwart the progression of the dwarf mistletoe. When the problem has advanced to include 70% of the Douglas Fir population, and perhaps more, the treatment of individual trees is no longer an option. More radical measures are required. These can range from a prescription cut, as proposed here, to a clear cut. Were the Forest Service to attempt to correct this problem by using Forest Service personnel to cut the trees, the cost to the government would be prohibitive. By bringing in a private timber company, the Forest Service kills two birds with one stone. It accomplishes the primary objective of treating the forest for dwarf mistletoe, and meets the multiple use standards by opening up the forest for timber harvest. It should also be noted that the results of forest treatment are in line with the statutory goals of timber stand improvement and planning for forest use in the future.

subject at issue. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419–420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).

We have recognized, however, certain exceptions to this general rule. The court may find it necessary to review additional material to explain the basis of the agency's action and the factors the agency considered. *Friends of the Earth* [*v. Hintz*] 800 F.2d [822] at 829 [ (9th Cir.1986) ]; *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1159–60 (9th Cir.1980). Moreover, the court may consider, particularly in highly technical areas, substantive evidence going to the merits of the agency's action where such evidence is necessary as background to determine the sufficiency of the agency's consideration. *Asarco,* 616 F.2d at 1160.

*Love v. Thomas,* 858 F.2d 1347, 1356 (9th Cir.1988).

Based on the foregoing guidelines, the Court grants plaintiffs' motion to strike the affidavits to the extent any should provide evidence beyond the scope of the guidelines as enunciated in *Love v. Thomas* and denies the plaintiffs' motion to strike the affidavits to the extent the information contained therein falls within the guidelines. In any event, the Court will limit its consideration of these affidavits in a manner consistent with *Love v. Thomas.*

## STANDARD FOR PRELIMINARY INJUNCTION

■ The traditional test used in determining whether a preliminary injunction should issue considers whether irreparable injury to the movant is likely if the injunction does not issue, and whether the movant is likely to succeed on the merits. Moore's Manual, Federal Practice and Procedure § 10.07[2] at p. 10–40 (1988), citing *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975). A four pronged test developed from this traditional test which includes consideration of the following factors:

1. the movant's likelihood of success on the merits;

2. whether or not the movant will suffer irreparable injury if the preliminary injunction does not issue;

3. whether or not that injury outweighs the harm to other parties if the preliminary injunction is issued; and

4. whether the grant or denial of the preliminary injunction is in the public interest. Moore's, § 10.07[2] at p. 10–40.

The Ninth Circuit has adopted the following test:

1. has the movant demonstrated either a likelihood of success on the merits and irreparable injury; or

2. has the movant raised serious questions going to the merits so as to make them fair grounds for litigation and does the balance of hardships tip heavily in the movant's favor. *Id.,* at p. 10–42, citing *Colorado River Indian Tribes v. Town of Parker,* 776 F.2d 846 (9th Cir.1985).

District Courts in the Ninth Circuit may also apply the four-pronged test should they so choose. Moore's, § 10.07[2] at p. 10–42, citing *Zepeda v. United States Immigration & Naturalization Service,* 753 F.2d 719 (9th Cir.1985).

This Court chooses to apply the four pronged test.

## DISCUSSION

This case involves allegations of detrimental environmental affects should a proposed logging sale in the Sawmill Creek area be implemented. The plaintiffs contend the Morgan Creek EA and the Sawmill Creek EA supplement and their attendant DN/FONSIs, which approve the terms of the sale and provide for its implementation, are inadequate, and a supplement to the FEIS, prepared in conjunction with the Plan, and approved in the ROD, is required. Analysis of these allegations is controlled by section 4332(2)(C) of Title 42, United States Code: NEPA.

NEPA was enacted to focus the attention of the government on a proposed action so that the consequences of the action could be studied before it is implemented, and so that potential negative environmental impacts can be avoided. NEPA was not de-

signed to achieve particular environmental results. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, ——, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377, 391 (1989). (*Marsh*). The standard to be applied when conducting a study of a proposed action is laid out in NEPA: an EIS is required if the government plans to undertake a "major federal action[ ] significantly affecting the quality of the human environment." [40]

"The subject of post-decision supplemental environmental impact statements is not expressly addressed in NEPA." *Marsh,* at ——, 109 S.Ct. at 1857, 104 L.Ed.2d at 390. (Footnote Omitted). However, judicial interpretation of NEPA and pertinent sections of the Code of Federal Regulations,[41] on the necessity of preparation of a supplemental EIS, provides the Court guidance. EIS supplements are required when there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Marsh,* at ——, 109 S.Ct. at 1858–59, 104 L.Ed.2d at 391–92.

> If an agency is unsure whether a proposed project requires an initial or supplemental EIS, federal regulations (footnote omitted) direct the agency to prepare an environmental assessment on which it may then base its decision. *See* 40 C.F.R. § 1501.4(b)–(c). The role of the EA is thus to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9.

*Oregon Natural Resources Council v. Lyng (Lyng),* 882 F.2d 1417, 1421–22 (9th Cir.1989).

■ In determining whether to prepare a supplemental EIS, the agency should apply a "rule of reason." This "rule of reason" requires the agency to take a "hard look" at any new information which comes to light, but does not require a supplemental EIS every time new information surfaces. Application of the "rule of reason" turns on the value of the new information. Thus,

the standard which controls the decision of whether a supplemental EIS is required is similar to the decision to prepare the EIS in the first place: "If there remains 'major federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared. (Footnote omitted). *Cf.* 42 U.S.C. § 4332(2)(C)." *Marsh,* 490 U.S. at ——, 109 S.Ct. at 1859–60, 104 L.Ed.2d at 392–93.

The agency's determination of the issues under the "rule of reason" is reviewed by this Court under the "arbitrary and capricious" standard enunciated in § 10(e) of the APA, 5 U.S.C. § 706(2)(A). *Id.,* at ——, 109 S.Ct. at 1860–61, 104 L.Ed.2d at 393–94. *See also, Lyng,* 882 F.2d at 1422. As in *Marsh,* "[t]he question presented for review in this case is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh,* 490 U.S. at ——, 109 S.Ct. at 1861, 104 L.Ed.2d at 394.

> Because analysis of the relevant documents "requires a high level of technical expertise" [especially with regard to the water quantity/quality and road construction issues] we must defer to the "informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 49 L.Ed.2d 576, 96 S.Ct. 2718 [2731] (1976). *See also, Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 76 L.Ed.2d 437, 103 S.Ct. 2246 [2255] (1983) ("When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential"). ... Accordingly, as long as the [decision] ... was not "arbitrary and capricious," it should not be set aside.

*Id.*

The Supreme Court cautions that deference to decisions based on the agency's

---

**40.** 42 U.S.C. § 4332(2)(C).

**41.** 40 C.F.R. § 1502.9(c); and 33 C.F.R. § 230.11(b).

experts should not be automatic. The circumstances must still be evaluated to determine that the agency's decision resulted only after a consideration of the significance or lack of significance of the new information. *Id.*, 490 U.S. at ——, 109 S.Ct. at 1861, 104 L.Ed.2d at 395.

■ The Court's analysis of the actions of the Forest Service in issuing the DN/FONSI on the Sawmill Creek sale will be carried out in two parts. First, the Court will analyze the actions of the Forest Service prior to the Sawmill Creek DN/FONSI. Second, the actions of the Forest Service with regard to the Sawmill Creek DN/FONSI will be considered.

The Morgan Creek EA was put together to consider whether a supplemental EIS was necessary before logging operations in the Morgan Creek drainage could begin. This EIS would supplement the FEIS prepared in conjunction with the Plan. At the time that the Morgan Creek EA was being put together, the Plan was also being constructed. The guidelines of the proposed Plan were considered in the analyses of the Morgan Creek EA.[42] As a result of the Morgan Creek EA, a DN/FONSI was issued. Since the Forest Service determined the proposed action did not involve a "major federal action significantly affecting the quality of the human environment," a supplemental EIS was not prepared.

The Morgan Creek EA and DN/FONSI included consideration of the Sawmill Creek Timber sale. The Sawmill Creek Timber sale was specifically included in Alternative V, the alternative chosen for the Morgan Creek sale. Before reaching the conclusion that a supplemental EIS was not necessary because "there will not be a significant impact on natural or human environments," the Forest Service analyzed sediment levels; water quality; water yield; erosion levels; visual impact; road construction and closure; and restriction of cuts in the timber harvest. Mitigation measures were implemented as were the State of Idaho "Best Management Practices" for water quality maintenance. The R–4 technical guide for erosion control was used as required by the Plan. Many of these measures and much of this analysis was undertaken as a result of the input of the plaintiffs. In sum, the Court is satisfied that the Forest Service took a "hard look" at the circumstances and thoroughly evaluated the impact of the proposed action in light of available information. Were the Court required to analyze this DN/FONSI, it would be satisfied the decision was neither arbitrary nor capricious. The Court would be inclined to approve the actions of the Forest Service in reaching this DN/FONSI. However, the story does not end there.

The Morgan Creek EA was supplemented in the Sawmill Creek EA. The only reason this supplemental EA was prepared, so far as the Court can discern, was to further address the concerns of the Churchwells in order to assure them that the issues relating to the Sawmill Creek timber sale had been thoroughly analyzed. The Forest Service was attempting, by taking this extra step, to convince the Churchwells that a supplemental EIS to the FEIS was not necessary. The Churchwells continue to demand a supplemental EIS. A supplemental EIS is required in the event new information, information not available or considered when the original EIS was prepared, is brought to the attention of the federal agency, or in the event of changed circumstances. The new information or changed circumstances, in order to mandate a supplemental EIS, must be significant. The Churchwells have offered neither. They have not advanced any new information, substantial or otherwise. They have not suggested the circumstances have changed in any way. They have merely attacked the efforts of the Forest Service and the results achieved. The Court understands their motivation: they are trying to protect their property against what they perceive as a potential threat. They don't want a logging operation to take place on property adjacent to theirs. However, the Churchwells forget they moved next door to public land. They do not take into consideration these lands

---

**42.** Administrative Record Document No.     000239.

must be administered, under MUSYA, for the good of all of the public, not just for the convenience of the Churchwells.

Under the standard as outlined in *Marsh* and *Lyng*, since no new information has been presented, and no changed circumstances have been advanced, there was no need to take a second look to see whether a supplemental EIS was needed. Without any significant new information or changed circumstances, the Forest Service could have rested on the original Morgan Creek EA and DN/FONSI. The Morgan Creek EA applied the standards, guidelines, and directions found in the proposed Plan. These standards remain the same in the Plan after its ROD approval.

Despite the fact that the Court believes the circumstances did not necessitate the preparation of the Sawmill Creek EA supplement, the Court will analyze the issues to determine whether the Forest Service took a "hard look" at the issues.

*1. Does the EA–DN/FONSI comply with the Plan on sedimentation standards and new road construction?*

The plaintiffs' argument with regard to sedimentation is based on the Plan's 2%/30% sedimentation standard. As is clear from the various affidavits, declarations, correspondence between the parties, the Plan itself, and arguments of counsel at the hearing, there are two different types of sediment. There is load or yield sediment and there are depth fines. Load or yield sediment is generally referred to as sediment, by those who work in the field, and depth fines are called depth fines. Sediment is made up of larger particles, those which would be caught by a ¼ inch strainer and depth fines are comprised of smaller particles—those which would pass through a ¼ inch strainer.[43] They impact a watercourse differently and are, therefore,

analyzed differently and are subject to different standards of regulation. According to the Plan, the 2%/30% standard applies to depth fines.[44] As is clear from plaintiffs' briefing and argument, they are unfamiliar with the difference between sediment and depth fines, and the application of the 2%/30% standard.

In his "Sediment Analysis Morgan Creek Drainage" performed in January 1989,[45] Roland Leiby reaches the conclusion that the percentage of depth fines in lower Morgan Creek (downstream from the confluence with Sawmill Creek) is 25% ("five percent from exceeding the threshold level [30%]"), and "it is estimated the percent depth fines will not increase beyond the threshold level in Lower Morgan Creek as a result of the Sawmill timber sale."[46] Leiby's study was done to facilitate the preparation of the Sawmill Creek EA. His conclusions indicate the timber sale, and the EA are in compliance with the Plan on sedimentation standards. His conclusions were reached through application of the R1/R4 computer model as a "technical guide to erosion control on timber sale areas" as required in the plan.[47] The Forest Service took a "hard look" at this issue and the plaintiffs' argument on this point is without merit.

As to road construction, the plaintiffs point to the "Ten Year Timber Sale Action Plan."[48] Road construction for the Sawmill Creek Timber sale is projected as 1.75 miles new road construction and 1.5 miles of road reconstruction in 1988. Plaintiffs argue any construction in excess of this amount is violative of the plan. However, at the bottom of the "Ten Year Timber Sale Action Plan" it states: "Timber harvest scheduling may be adjusted as needed to meet unforeseen changing conditions or catastrophic events such as wildfires and

---

**43.** Affidavit of Roland Lieby.

**44.** Administrative Record Document No. 000008: Plan page IV–21, ¶ 5(f).

**45.** Exhibit 1 to declaration of Peter Stender.

**46.** *Id.* The court notes that since Sawmill Creek feeds only lower Morgan Creek, the sale can have no affect on upper Morgan Creek.

**47.** Administrative Record Document No. 000008: Plan page IV–21, ¶ 5(c).

**48.** Administrative Record Document No. 000008: Plan Page IV–222.

*INSECT AND DISEASE INFESTATION* resulting in unacceptable resource losses, as determined by management." [49] The purpose of the Sawmill Creek timber sale is the eradication of dwarf mistletoe infestation, a "catastrophic event." The Forest Service was acting within its proper discretion, as outlined in the Plan, in its determination that the Sawmill Creek sale required the construction of 4.8 miles of new roads. This decision was consistent with the terms of the Plan. The Forest Service took a "hard look" and the plaintiffs' argument on this issue is without merit.

2. *A supplemental EIS is necessary because the EA did not give sufficient consideration to the cumulative impacts of:*

    a.  sediment;

    b.  increased road construction; and

    c.  the sale on Morgan Creek, Management Area 21, and the Forest as a whole.

Subparts a and b have been considered above and will not be considered again here.

The contentions in subpart c are without merit. Cumulative effects were analyzed in the Sawmill Creek EA. [50] Additionally, the impacts of the sale were considered in great detail in so far as Morgan Creek is concerned in preparation of the Morgan Creek EA. The timber sale was contemplated in the management prescription for Area 21 and in the Plan's "Ten Year Timber Sale Action Plan." The cumulative impact, if any, on these areas outside Sawmill Creek was contemplated in the overall scheme of the Plan. The Forest Service has taken a "hard look" at this issue.

3. *An EIS is required because the EA does not have an effective "No–Action Alternative."*

Of the three alternatives, alternative 1 was the no-action alternative. This alternative was rejected because the dwarf-mistletoe infestation demands attention, and because implementation of alternative 1 would violate Plan directives to integrate appropriate forest pest management into timber management. [51] The problem is not that the Forest Service did not have an effective no-action alternative. The problem is that, because of the immediate concerns associated with dwarf mistletoe, and the threat that the mistletoe would be followed by an infestation of Western Douglas Fir beetles, and that this would lead to increased fire risk and the potential for a devastating fire due to the increased fuel loading, a no-action alternative was not viable. The Forest Service gave this area a "hard look" and the plaintiffs argument as to this issue is without merit.

4. *An EIS is required because the EA failed to take a hard look at the way the sale impacts:*

    a.  the Churchwells' domestic water supply; and

    b.  noise.

Seven separate measures to mitigate the impacts, if any, on the Churchwell's domestic water supply were implemented in the EA. [52] Both water yield and water quality to the Churchwells' domestic water supply were considered at various places throughout the EA. In the comparison of alternatives section of the EA, it was concluded, based on application of the water yield model (WRENSS, 1980), that water yield will be similar to that of the existing or natural condition. [53] Stream quality has been discussed above, and will not be reexamined here. It must be kept in mind that the EA supplement was done for the benefit of the Churchwells. In listing the "Issues and Concerns Pertinent to this Evaluation," number one was "Water Yield—Effects of proposed harvest on water yield,

---

**49.** *Id.* (Emphasis added).

**50.** Administrative Record Document No. 000218: Sawmill Creek EA Supplement page 18 part VI.

**51.** Administrative Record Document No. 000211, *citing* Plan pages IV–16 and IV–18.

**52.** *See* Footnotes 30–35, *supra,* and accompanying text. Administrative Record Document Nos. 000211–000212. In Section IV: Mitigation Measures, paragraphs A(1)–(4), B, C, and E all contain measures designed to lessen any adverse affects on water yield and water quality.

**53.** Administrative Record Document No. 000213: EA § V, ¶ A(3), page 13.

especially to Sawmill Creek. Alternatives will be evaluated with regard to how they will change water yield." [54] Number two contains identical language with regard to water quality. In the DN/FONSI itself, a specific finding of no significant impact on the quality or quantity of the Churchwells' domestic water supply is made. The Forest Service took a "hard look" and the plaintiffs' argument on this issue is without merit.

Mitigating measures were included in the EA to lessen the degree of noise which the Churchwells would experience as a result of the logging activities. Sixty acres of harvest were eliminated to provide an increased buffer zone between the logging activities and the Churchwells' property and logging activities were limited to two units at a time. This decreases the amount of activity at any one given time and moves it away from the Churchwells' property. The Forest Service took a "hard look" and the plaintiffs' argument on this issue is without merit.

## PRELIMINARY INJUNCTION

1. The Churchwells' likelihood of success on the merits.

Based on the above discussion, the Court is of the opinion the Churchwells have virtually no chance of success on the merits.

2. Irreparable injury.

The Court is of the opinion the Churchwells will be subjected to the possibility of noise discomfort. However, the Forest Service has taken measures to lessen this discomfort. The evidence with regard to the water issues indicates any negative impact will be extremely slight, if any. The Churchwells have failed to demonstrate they will suffer irreparable injury if an injunction does not issue.

3. Do the injuries to the Churchwells outweigh the harm to others should the injunction issue?

The Churchwells have failed to demonstrate they will suffer injury.

4. Public interest.

The public interest lies in the denial of the injunction. The eradication of the dwarf mistletoe, in addition to providing jobs and adding income to the local community, will serve to create a healthier forest in the future. It also serves to reduce the risk of wildfire in the area.

Based on the above analysis, the complaint for a preliminary injunction is DENIED.

## CONCLUSION

A supplemental EIS is required when significant new information or changed circumstances are brought to the attention of the responsible federal agency. No new information or changed circumstances have been advanced by the plaintiffs. A supplemental EIS is not required in this case.

An agency's decision, such as the Forest Service's finding of no significant impact and decision not to prepare supplemental EIS, will be overturned when it is arbitrary and capricious. A finding that a decision is arbitrary and capricious is warranted when the agency fails to take a "hard look" at new information or changed circumstances. Here, there was no new information or changed circumstances. There was nothing to compel the Forest Service to prepare the supplemental EA to the Morgan Creek EA.

In preparation of the supplemental EA, the Forest Service took a "hard look" at the issues raised, and concerns expressed, by the plaintiffs. The decision of the Forest Service to approve the supplemental EA, not to require preparation of a supplemental EIS, and to approve the Sawmill Creek timber sale was not arbitrary and capricious, and is therefore ratified by this Court.

In their request for relief, the plaintiffs requested the issuance of a preliminary injunction. The burden was on the plaintiffs to demonstrate their likelihood of success on the merits; that they would suffer irreparable injury should the injunction not issue; that injury to them outweighed any harm to others; and that issuance of the

**54.** Administrative Record Document No. 000203: EA § 1(D)(2)(1), page 3.

injunction was in the public interest. They failed on all four counts. The evidence does not support their request for relief, so the request for issuance of a preliminary injunction is denied.

### ORDER

In accordance with the memorandum decision issued simultaneously herewith, and as more thoroughly discussed therein, the plaintiffs' request for the issuance of a preliminary injunction is denied. Because the remainder of the plaintiffs' requested relief is based on the issuance of the preliminary injunction, and the plaintiffs' success on the merits, and because the plaintiffs were unsuccessful, the plaintiffs' complaint is DISMISSED, and this case is ordered CLOSED.

IT IS SO ORDERED.